# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00704-CV

**Appellants, Dennis White and Karen Hamlett f/k/a Karen Baugh//
Cross-Appellant, Larry Baugh**

**v.**

**Appellee, Larry Baugh//
Cross-Appellees, Dennis White and Karen Hamlett f/k/a Karen Baugh**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
### NO. 487,260, HONORABLE PETER M. LOWRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Spouses Dennis White and Karen Hamlett appeal a judgment awarding Larry Baugh, Hamlett's ex-husband, title to and possession of real property located in Travis County. Baugh had sued to enforce the property division in the 1991 divorce decree that had ended his marriage with Hamlett, which had included a residuary clause that awarded all undisclosed property to the party not in possession of it. Baugh's central theory at trial was that the decree had awarded him the real property because the property had been purchased with community funds while they were still married. In six points of error, White and Hamlett challenge the legal and factual sufficiency of the evidence supporting two of the jury findings; assert that the district court erred in denying their motion for new trial, motion to disregard jury findings, and motion for judgment notwithstanding the verdict; and contend that the district court abused its discretion in awarding Baugh $55,000 in

attorney's fees. In a cross-appeal point of error, Baugh asserts that the district court abused its discretion by assessing the attorney's fees award against Hamlett but not White. We will affirm the judgment.

## BACKGROUND

The jury heard evidence that, in 1981, Baugh and Hamlett married. During their marriage, they acquired substantial community property, including a home valued at over $500,000 located in Austin's West Lake Hills area, a ranch in Manor where they bred race horses, and a vacation home in New Mexico. The couple had two daughters.

Baugh's and Hamlett's lives changed dramatically beginning in February 1988, when Baugh was arrested and later pleaded guilty to income tax evasion and possession of marihuana with intent to deliver, resulting in his incarceration from 1988 until 1994. Following Baugh's arrest, Hamlett took control of the family's financial affairs. While some of the couple's assets were seized or forfeited during the criminal proceedings, Hamlett retained control over, and liquidated, most of their other assets, including at least one bank account that had "[p]robably a few thousand dollars" in it, at least 50 race horses valued at approximately $5,000 each, and all of the ranch equipment, vehicles and accounts receivable from the family's business.[1] Hamlett's parents, Gladys V. Hamlett and Martin Leon Hamlett, moved from El Paso to Austin to assist their daughter during this time.

---

[1] Hamlett testified that she used some of the funds from the sale of the assets to attend nursing school in 1989.

Gladys moved in with Hamlett and Hamlett's daughters. Also in 1988, Hamlett began dating Dennis White, a former employee at the horse ranch.[2]

By October 1988, Hamlett had filed for bankruptcy and could no longer afford payments on the house.[3] The lender instituted foreclosure proceedings. Hamlett testified that she contacted a realtor to help her find a new place to live. One day, while Hamlett and her mother were driving around the area looking for a place to rent, they came across a townhouse for sale at 6405 Weatherwood Cove. Hamlett contacted the realtor for information about the property.

In February 1989, Hamlett's parents signed an earnest money contract to purchase the townhouse for $74,000.00, to be paid, in part, from the proceeds of a $52,000 loan. In April 1989, the parents, under their names, executed a promissory note and mortgage with Homestead Savings for $52,000, with monthly payments of $437.50 per month for thirty years. In the loan application, the parents specified that their income at the time was $1,177 per month. They also claimed additional income of $365 per month from Hamlett's leasing of their El Paso property. However, Hamlett admitted that she never actually rented her parents' El Paso house—to the contrary, she moved directly from the house in Westlake to the house on Weatherwood Cove. Hamlett provided the following testimony about the purported lease agreement:

> Q:    In 1989 you signed a lease that was fictitious about moving to El Paso in
>       order to make sure that you could get the Weatherwood Cove home; is that
>       correct?

---

[2] White testified that he worked as a carpenter at the ranch for approximately six months in 1984, also performing various duties like feeding the horses.

[3] According to Hamlett, the bankruptcy was never completed.

A:    I signed it in order for my parents to be able to buy that home.

. . . .

Q:    And you were willing to lie to have that happen?

A:    I don't recall the rationale behind it, but it was a necessary thing in order for my parents to get the loan.

Appellants also acknowledge in their brief that the lease of the El Paso property was "phony."

In 1990, while Baugh remained incarcerated, White moved in with Hamlett and her daughters at their Weatherwood Cove residence. In February 1991, Baugh and Hamlett divorced. In June of that same year, Hamlett's parents signed a contract to sell the Weatherwood Cove property to White. The sales contract provided that the purchase price was $57,000, with financing by the sellers, on a note with principal and interest payments of $437.25 per month for 28 years. These terms corresponded with the amount and term of payments remaining on the parents' mortgage. The contract also provided that closing and title transfer would occur upon full payment of the note.

In 1993, approximately one year after White and Hamlett purported to be married under common law, the parents transferred title to White. According to the 1993 closing statement, the sales price was $74,000, with a portion of the price financed through a mortgage in White's name. The mortgage loan application specified that title would be held in the name of "Dennis Dale White," a "single male." The warranty deed conveyed title to "Dennis Dale White, a single person." At trial, White was unable to explain why these documents referred to him as single when, in fact, he was married to Hamlett at the time the documents were executed.

4

Hamlett's parents received $21,401.41 in cash at closing. However, there was evidence presented at trial that, three weeks after closing, this same amount was deposited back into White and Hamlett's joint bank account. When confronted with a deposit slip for the exact amount of the sellers' proceeds, showing that the funds were deposited into this bank account, White testified that he was "a little confused." However, when asked if the matching amounts were "just a coincidence," White responded, "No." White also claimed that he and Hamlett did not own a joint bank account at the time of the closing. However, after he was shown an account statement for the month in which the closing occurred and the deposit was made, he acknowledged that both his and Hamlett's names appeared on the statement. Hamlett testified that the money deposited into the account belonged to both her and White, and she agreed with Baugh's characterization of her "as sort of a silent partner" in White's purchase of the home.

In January 2001, Baugh learned for the first time about the Weatherwood Cove property. Baugh testified that Gladys, Hamlett's mother, told him that "the truth about that home purchase in Austin" was that "it was Karen's purchase all along." According to Baugh, Gladys added, "We were nothing more than her trustee."

In March 2001, Baugh filed suit against Hamlett to enforce the property division in the divorce decree. Baugh alleged in his petition that the decree failed to specifically award the property located at 6405 Weatherwood Cove and that, under the terms of the decree's residuary clause, the property belonged to him.[4] In 2002, Baugh amended his petition to add White as a

---

[4] The residuary clause provides the following:

Division of Assets and Liabilities Not Provided for In Decree.

5

defendant. Baugh alleged that White conspired with Hamlett's parents to convey title in the subject property to White.

During discovery, Hamlett's mother executed a sworn statement describing the circumstances surrounding the purchase:

> TO WHOM IT MAY CONCERN:
>
> Narrative of events relating to purchase of home at 6405 Weatherwood Cove, Austin, Texas 78746, by Gladys Hamlett, covering the time period from 1988 to 1992.
>
> In the summer of 1988, my daughter, Karen Baugh (nee Hamlett), was separated and intending to divorce her husband Larry Baugh. She asked if I and Mr. Hamlett (her parents) would purchase a home for her, in our name. She found the home, *gave me the purchase money* (in cash), and I and Mr. Hamlett did purchase the home FOR HER. *We had no funds or interest in the home at all.* Karen was always responsible for and made the mortgage payments, taxes, etc.
>
> A fire occurred in Nov. 1990, for which an insurance check for about $30 thousand was issued, and I signed over to Karen. She used it for repairs. Not me.
>
> In the summer of 1991, Karen asked me to leave the home where I had been residing with she and her two children. I moved away since it was her home, and had always been in her control.

---

> IT IS FURTHER ORDERED AND DECREED, as a part of the division of the estate of the parties, that any community property or its value not otherwise awarded by this decree is awarded to the party not in possession or control of the property. IT IS FURTHER ORDERED AND DECREED that the party in possession and control of such property is designated a constructive trustee of the property for the benefit of the other party.
>
> IT IS FURTHER ORDERED AND DECREED, as a part of the division of the estate of the parties, that any community liability not expressly assumed by a party under this decree is to be paid by the party incurring the liability.

> Later that summer or fall, she asked me and Mr. Hamlett to sign the house into her name. We agreed and did sign and transfer title to Karen (Hamlett), since she was now divorced.
>
> This statement is from memory, and is substantially accurate.
>
> Given this 23rd day of Feb. 2001
> //s// Gladys Hamlett

(Emphasis added). This affidavit was admitted into evidence, along with Gladys's deposition testimony from 2001. In the deposition, Gladys provided additional details about the purchase. Among other details, Gladys testified that she and Leon did not have the financial ability to purchase the house. Gladys also testified that she did not remember how much money Hamlett gave her to purchase the house, but she thought it could have been $10,000 in cash that Hamlett had previously set aside "in her closet in a boot." Gladys further testified in her deposition that every statement in her affidavit was true and correct. Later at trial, however, Gladys recanted her prior statements, testifying that her statements in the affidavit were not true and that she had lied during her deposition.

At the conclusion of trial, the district court submitted jury issues regarding the extent to which the townhouse had been purchased with Baugh and Hamlett's community funds, whether Baugh was estopped from asserting or had waived his claim to the property, whether White was a bona fide purchaser for value when he bought the property, and the amount of each parties' attorney's fees. The jury found that the property had been purchased entirely with community funds, that Baugh was not estopped from and had not waived his claim to the property, that White was not a bona fide purchaser for value, and that Baugh had incurred $55,000 in trial-level attorney's fees,

7

plus $5,000 for an appeal to this Court, and another $5,000 each if a petition for review was filed in or granted by the supreme court. The district court rendered judgment on the jury's verdict, awarding Baugh title to and possession of the property, and that he recover from Hamlett the amount of attorney's fees found by the jury. This appeal followed.

## DISCUSSION

### Community funds

Appellants' first five points of error concern the jury's findings related to community funds. Question 1 of the charge asked, "Was all or a portion of the property located at 6504 Weatherwood Cove Austin, Texas purchased with the community funds of Larry Baugh and Karen Baugh in 1989?" Conditioned on an affirmative answer to Question 1, Question 2 inquired as to the amount of community funds that were used for the purchase. The jury was instructed not to answer Question 2, however, if it found that all of the funds used to purchase the property were community funds. The charge defined "community property" as "the property, other than separate property, acquired by either spouse during marriage" and "separate property" as "property owned or claimed by a spouse prior to marriage, or acquired by gift, devise, or descent." The jury found in the affirmative on Question 1, but did not answer Question 2. By this, the parties agree that the jury necessarily found that the Weatherwood Cove property had been purchased entirely with community funds. In appellants' first and second points of error, they contend there is either legally or factually insufficient evidence to support the jury's findings that the property was purchased *entirely* with community funds. In their third point of error, appellants assert that there is factually insufficient evidence to support the jury's finding in Question 1 that a *portion* of the property was purchased with

8

community funds.[5] In their fourth and fifth points of error, appellants argue that the district court abused its discretion in overruling their motion for new trial and erred by denying their motion to disregard jury findings and motion for judgment notwithstanding the verdict. In these points, they assert the same arguments they raise in their sufficiency points.

We will sustain a legal-sufficiency complaint if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). We review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Id*. at 807. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id*. at 827.

When reviewing a challenge to the factual sufficiency of the evidence supporting a vital fact, we must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We should set aside the verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d

---

[5] Appellants concede that there is legally sufficient evidence to support the jury's finding that at least a portion of the property was purchased with community funds.

175, 176 (Tex. 1986).  But we may not merely substitute our judgment for that of the jury.  *Pool*, 715 S.W.2d at 635.  The jury remains the sole judge of witnesses' credibility and the weight to be given their testimony.  *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

With both legal and factual sufficiency challenges, the starting point of our analysis—barring a preserved and valid complaint of charge error, and there is none here—is the charge actually submitted to the jury.  *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 762 (Tex. 2003) (factual sufficiency); *Ancira Enters., Inc. v. Fischer*, 178 S.W.3d 82, 93 (Tex. App.—Austin 2005, no pet.).

In their challenges to the findings that all of the funds used to purchase the property were community funds, appellants rely entirely on the fact Hamlett's parents took out a $52,000 loan under their names in connection with the purchase of the property.  Appellants urge that this fact conclusively establishes that Hamlett's parents, not Hamlett, acquired the property and paid at least this portion of the purchase price.  We disagree.

Under the broad form questions submitted to the jury, the jury was asked simply to determine whether all or a portion of the property was purchased in 1989 with the community funds of Hamlett and Baugh.  The form of these questions enabled the jury to find that the property was purchased using only community funds under any legal theory supported by the evidence.  *See Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999) ("When feasible, jury questions should be in broad form, accompanied by appropriate instructions and definitions.  A single question may relate to multiple legal theories.") (citing Tex. R. Civ. P. 277).  Further, under the definitions

10

provided by the district court, the jury was to presume that property acquired during marriage by either spouse was community property unless it was shown to be separate property. Appellants have preserved no complaint of error in these questions, definitions or instructions, nor regarding the omission of any questions, definitions or instructions.

The evidence enabled the jury to find that the property had been purchased exclusively with community funds based on legal theories that included resulting trust,[6] agency, and that Hamlett and her parents engaged in a scheme to conceal her ownership and defraud Baugh of his community property rights.[7] Among other evidence, the jury considered Gladys's statements that Hamlett "found the home, gave me the purchase money (in cash), and I and Mr. Hamlett did purchase the home FOR HER," and that she and her husband "had no funds or interest in the home at all." Gladys also stated that Hamlett "was always responsible for and made the mortgage payments, taxes, etc.,"[8] and appellants point to no evidence, other than Gladys's subsequent recantations, that anyone else ever made such payments. When asked during her deposition who was going to pay for the purchase price of the house, Gladys answered, "Not us."

The jury also heard evidence indicating that the parents did not have the financial resources to assume the note obligations and purchase the property. In addition to Gladys's

---

[6] *See Sahagun v. Ibarra*, 90 S.W.2d 860, 863-64 (Tex. App.—San Antonio 2002, no pet.).

[7] Appellants argue that it was Baugh who had the burden to obtain jury findings on each of these theories. As these theories were subsumed within the unobjected-to broad-form questions actually submitted to the jury, we reject that contention. *See* Tex. R. Civ. P. 278, 279.

[8] *See Dalton v. George B. Hatley Co.*, 634 S.W.2d 374, 379 (Tex. App.—Austin 1982, no writ) ("[P]ayment or satisfaction [of an instrument] may be made with the consent of the holder by any person including a stranger to the instrument.").

11

statements, the parents' 1988 and 1989 tax returns were admitted into evidence, which reported total income of $14,591.23 in 1988 and $20,946.60 in 1989. Moreover, the parents' residential loan application stated that their income at the time of the loan application was $1,177 per month, while their existing mortgage and utilities payments on their house in El Paso totaled $446.00 per month. The mortgage on the Weatherwood Cove property was $437.25 per month. Adding other costs, such as property taxes, to that amount results in total housing costs of $551.83 per month for the Weatherwood Cove property. Thus, when the two house payments are added together, the parents would have owed over $997 per month on housing costs alone. Subtracting this amount from the parents' monthly income of $1,177 would have left them less than $200 per month for other living expenses, such as food, clothing, and transportation.

The jury also considered other evidence that Hamlett acted as the owner of the property, including the application for utility service submitted to the Municipal Utility District in 1989, which was made on behalf of "Karen Baugh by Gladys Hamlett" and directed that billing be sent to Karen Hamlett. There was also evidence that even though Hamlett's parents supposedly owned the property, Leon never lived there and Gladys did so only so long as Hamlett permitted. Similarly, a 1993 statement from the Valley of Lost Creek Homeowners Association predating the title transfer to White identifies Hamlett as an owner and states that "Dennis White and Karen Hamlett are members in good standing of the Valley of Lost Creek Homeowners Association and owe no fees or dues." Finally, the circumstances of the eventual sale of the property to White, the jury could have concluded, were consistent with both an ongoing strategy to conceal Hamlett's interest in the property (e.g., the false description of White as single) and a recognition by the

12

participants that Hamlett had been the beneficial owner all along. These circumstances include evidence that three weeks after the parents transferred title to White, $21,401.41 was deposited into a joint bank account belonging to White and Hamlett. This amount precisely matched the amount of cash that the parents had received at closing. The jury could have inferred from this evidence that Hamlett's parents were returning the proceeds they had received in the sale, including the value of what would have been any accumulated equity in the property. We conclude that when viewed in the light favorable to the verdict, the above evidence is legally sufficient to support the jury's findings. We overrule appellants' first issue.

Regarding their factual sufficiency challenge, appellants argue that the only evidence supporting the jury findings is Gladys's statement in her affidavit, which she later disclaimed at trial, that she and her husband "had no funds or interest in the home at all." This statement, according to White and Hamlett, "is absolutely overwhelmed by the single but altogether sufficient fact that the Hamletts, and the Hamletts alone, obtained $52,000.00 dedicated to the purchase of the property from the proceeds of a loan for [which] they, and they alone, were liable."

We have already discussed the evidence relating to the $52,000 loan, and it is not limited to the single statement that appellants emphasize. It is true that Gladys later recanted both her affidavit and her deposition testimony at trial. However, it was within the jury's province to credit Gladys's prior statements and disbelieve her trial testimony. The jury heard evidence that Gladys and her daughter Hamlett had a strained relationship. Hamlett testified that, in 1994, she asked Gladys to move out of their house. Gladys testified that this made her angry, hurt, and scared. Furthermore, Gladys testified that when her husband died in 1999, Gladys had a legal dispute with

her daughters over the disposition of her husband's estate. There was also acrimony involving Hamlett's daughter and Gladys's granddaughter, Tara. Tara testified that she had a good relationship with her grandmother, and that they talked "everyday, several times a day." By contrast, Tara did not have "much of a relationship" with her mother. Tara, who was 25 at the time of trial, testified that she moved out of her mother's house when she was 15 and moved in with Gladys. However, Tara also testified that, "a few years ago," she and her mother "started talking again and trying to work through some of the things that we didn't like about each other." In fact, there was evidence presented that Hamlett came to Tara's aid during the weeks immediately prior to trial and provided Tara with money to prevent Tara's house from being foreclosed. Appellants assert that these issues between Gladys and her daughter prompted Gladys to lie in 2001 about the circumstances surrounding the purchase of the property. However, the jury was entitled to believe the contrary proposition—that the mother-daughter acrimony during the '90s prompted Gladys in 2001 to come forward with the truth about her daughter's deception, and that Hamlett's assistance to Tara prior to trial had prompted Gladys—whom the jury could have concluded had periodically engaged in other deceptive acts to help Hamlett—to resume that pattern at trial.

Hamlett denied that any community funds had been used in the purchase of the property, and she claimed that the money deposited into the joint bank account was a gift from her parents, not a repayment of money that she had originally contributed toward the purchase of the house. However, the jury was entitled to disbelieve this testimony, especially in light of the other evidence tending to bring Hamlett's credibility into question. Appellants also emphasized evidence concerning Baugh's criminal problems. This evidence, at most, goes to the credibility of Baugh as a witness.

14

Appellants also presented evidence that White spent between $150,000 and $200,000 in improving the property after he purchased it. Thus, according to White and Hamlett, it is "unfair" for Baugh to benefit from these improvements. To the extent appellants are claiming an entitlement to reimbursement, or offset, for these improvements, they have waived it. "The right to an offset is an affirmative defense. The burden of pleading and proving facts necessary to support an affirmative defense of offset rests on the party making the assertion." *Mays v. Bank One, N.A.*, 150 S.W.3d 897, 899 (Tex. App.—Dallas 2004, no pet.) (citing *Brown v. American Transfer and Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980)). Appellants did not plead any affirmative defenses at trial, nor did they request any jury instructions on this issue. They cannot raise it for the first time on appeal. *See Columbia Med. Ctr. of Las Colinas v. Bush*, 122 S.W.3d 835, 862 (Tex. App.—Fort Worth 2003, pet. denied) ("Regardless of the merits of Appellants' argument that they are entitled to an offset, because they did not plead an affirmative defense of offset, this issue is waived.").

After considering all of the evidence in the record, we conclude that the evidence supporting the jury's findings that the property was purchased entirely with community funds is not so weak as to be clearly wrong and manifestly unjust. We overrule appellants' second point of error. Further, as our disposition of appellants' first two points of error are dispositive of their third, fourth, and fifth ones, we overrule them as well.

**Attorney's fees**

In their sixth point of error, appellants urge that if we reverse the judgment, we should remand the issue of attorney's fees to the district court for redetermination. Because we have

overruled appellants' points challenging the merits of the judgment, we overrule their attorney's fees point as well.

In his cross-point of error, Baugh asserts that it was an abuse of discretion for the district court to assess his attorney's fees solely against Hamlett and not against White. He contends that because the jury found that White was not a bona fide purchaser for value, the jury also necessarily found that White was not acting in good faith. Thus, according to Baugh, White should necessarily be liable for attorney's fees. On this record, we find no abuse of discretion in the district court's decision to order Hamlett, but not White, to pay the attorney's fees. We overrule Baugh's cross-point.

**CONCLUSION**

Having overruled White and Hamlett's points of error and Baugh's cross-appeal point of error, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: May 28, 2008

16